FILED

CLERK, U.S. DISTRICT COURT

MAR 23 2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RS _____ DEPUTY

**S/I**

1   NIALL P. MCCARTHY (SBN 160175)
    nmccarthy@cpmlegal.com
2   TAMARAH P. PREVOST (SBN 313422)
    tprevost@cpmlegal.com
3   **COTCHETT PITRE & McCARTHY, LLP**
4   San Fransisco Airport Office Center
    840 Malcolm Road
5   Burlingame, California 94010
    Telephone: (650) 697-6000
6   Facsimile: (650) 697-0577

7   KELLY W. WEIL (SBN 291398)
    kweil@cpmlegal.com
8   THERESA E. VITALE (SBN 333993)
    tvitale@cpmlegal.com
9   JEFFREY G. MUDD (SBN 326304)
    jmudd@cpmlegal.com
10  **COTCHETT PITRE & McCARTHY, LLP**
11  2716 Ocean Park Boulevard, Suite 3088
    Santa Monica, CA 90405
12  Telephone: (310) 392-2008
    Facsimile: (310) 392-0111
13

14  *Attorneys for Relator*

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17  [UNDER SEAL],                    | CASE NO. **2:22-CV-01902-SB-RAO**

18              Plaintiffs,          | **COMPLAINT FOR:**

19      v.                           | **1. Submission of a False Claim**
20                                   |    **31 U.S.C. § 3729(a)(1)(A)**

21  [UNDER SEAL],                    | **2. Making False Statement in**
22              Defendants.          |    **Support of a Claim**
                                     |    **31 U.S.C. § 3729(a)(1)(B)**
23
24                                   | **3. Improper Retention of Money**
                                     |    **Owed to the Government**
25                                   |    **31 U.S.C. § 3729(a)(1)(G)**

26                                   | **DEMAND FOR JURY TRIAL**

27                                   | **[FILED IN CAMERA AND UNDER**
28                                   |    **SEAL PURSUANT TO 31 U.S.C.**
                                     |    **§3730(B)(2)]**

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**COMPLAINT**

1  NIALL P. MCCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  TAMARAH P. PREVOST (SBN 313422)
   tprevost@cpmlegal.com
3  **COTCHETT PITRE & McCARTHY, LLP**
4  San Fransisco Airport Office Center
   840 Malcolm Road
5  Burlingame, California 94010
   Telephone: (650) 697-6000
6  Facsimile: (650) 697-0577

7
8  KELLY W. WEIL (SBN 291398)
   kweil@cpmlegal.com
9  THERESA E. VITALE (SBN 333993)
   tvitale@cpmlegal.com
10 JEFFREY G. MUDD (SBN 326304)
   jmudd@cpmlegal.com
11 **COTCHETT PITRE & McCARTHY, LLP**
12 2716 Ocean Park Boulevard, Suite 3088
   Santa Monica, CA 90405
13 Telephone: (310) 392-2008
   Facsimile: (310) 392-0111

14 *Attorneys for Relator*

15              **UNITED STATES DISTRICT COURT**

16              **CENTRAL DISTRICT OF CALIFORNIA**

17 | **UNITED STATES OF AMERICA AND** | CASE NO. |
18 | **THE STATE OF CALIFORNIA** *ex rel.* | |
   | **HAROLD BAUTISTA** | **COMPLAINT FOR:** |
19 | | |
   |              Plaintiffs, | **1. Submission of a False Claim** |
20 | | **31 U.S.C. § 3729(a)(1)(A)** |
   |              v. | |
21 | | **2. Making False Statement in** |
22 | **TOWER OUTPATIENT SURGERY** | **Support of a Claim** |
   | **CENTER, INC.** a California corporation,, | **31 U.S.C. § 3729(a)(1)(B)** |
23 | **JOEL A. ARONOWITZ, M.D., A** | |
   | **MEDICAL CORPORATION,** d/b/a, | **3. Improper Retention of Money** |
24 | Tower Multi-Specialty Medical Group, a | **Owed to the Government** |
   | California Corporation, **TOWER** | **31 U.S.C. § 3729(a)(1)(G)** |
25 | **WOUND CARE CENTER OF SANTA** | |
   | **MONICA, INC.,** a California corporation, | **DEMAND FOR JURY TRIAL** |
26 | and **TOWER MEDICAL BILLING** | |
   | **SOLUTIONS,** d/b/a Medicommerce, a | |
27 | California Corporation | **[FILED IN CAMERA AND UNDER** |
   | | **SEAL PURSUANT TO 31 U.S.C.** |
28 |              Defendants. | **§3730(B)(2)]** |

## <u>TABLE OF CONTENTS</u>

<u>**PAGE NO.:**</u>

I.   INTRODUCTION .................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................ 4

III. PARTIES .................................................................................................. 4

IV. OVERVIEW OF THE SCHEME ........................................................... 7

      A. The United States Medicare System .................................................. 7

      B. Ambulatory Surgical Centers ("ASCs") ........................................... 8

      C. Defendants' Fraudulent Billing Scheme ........................................... 10

V.  RELATOR'S INVESTIGATION .......................................................... 13

VI. DEFENDANTS CONTINUE TO INTENTIONALLY WITHOLD PAYMENTS 19

VII. CAUSES OF ACTIONS ....................................................................... 20

      FIRST CAUSE OF ACTION ············································· 20

      SECOND CAUSE OF ACTION ········································· 22

      THIRD CAUSE OF ACTION ·············································· 22

VIII. PRAYER FOR RELIEF ....................................................................... 23

IX.  DEMAND FOR JURY TRIAL ............................................................ 24

## I.     **INTRODUCTION**

1.     Relator Harold Bautista ("Relator") brings this action on behalf of the United States pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G), to recover losses sustained by the Centers for Medicare & Medicaid Services ("CMS") as a result of the operations of Defendants Tower Outpatient Surgery Center, Inc. ("Tower Outpatient"), Joel A. Aronowitz, M.D., A Medical Corporation, doing business as Tower Multi-Specialty Medical Group ("Tower Multi-Specialty"), Tower Wound Care Center of Santa Monica, Inc. ("Tower Wound Care," and together with Tower Outpatient and Tower Multi-Specialty, the "Tower Providers"), and Tower Medical Billing Solutions ("Tower Billing").

2.     Relator has worked for Tower Outpatient since March 15, 2017, initially as a "Biller," then as a "Revenue Cycle Manager" starting in late-2019 and, finally as a "Billing Specialist, TMMG" since January 2022.   In these roles, Relator's responsibilities spanned various billing and accounting functions, including with respect to the auditing of bills submitted to CMS for medical services provided at facilities operated by the Tower Providers.

3.     Relator has direct and independent knowledge of the non-public information upon which these allegations are based, by virtue of the nature of his employment with Tower Outpatient.  In his positions of Biller, Revenue Cycle Manager, and Billing Specialist, TMMG, Relator had, and continues to have, direct access to billing records, communications, financial information, and other documentation and evidence of Defendants' fraudulent scheme.  The facts alleged in this Complaint are based upon Relator's personal observations and investigations, as well as documents in his possession by virtue of his employment with Tower Outpatient.

4.     Over the course of approximately 6 years or more, from at least 2015 through early 2021, Defendants defrauded CMS by submitting incorrect and misleading billing codes for various medical services provided to thousands of patients. Defendants' fraudulent practices involved massive overcharges to CMS and, as a result,

enormous ill-gotten profits to Defendants.

5.      As part of Defendants' scheme, numerous billing claims submitted to CMS by the Tower Providers represented that medical services were provided to patients at an ambulatory surgery center ("ASC"), when those services were in fact provided in an office (non-ASC) setting.  More specifically, such claims represented that medical services were provided to patients at ASCs operated as Tower Outpatient and/or Tower Wound Care (both qualified ASCs), when those services were in fact provided at office locations operated as Tower Multi-Specialty, none of which are qualified ASCs.

6.      Defendants perpetrated this scheme by submitting billing claims that either misrepresented where the procedures were actually performed, or by classifying non-ASC facilities operated as Tower Multi-Specialty as "satellite" locations to the ASC operated by Tower Outpatient, and treating those "satellite" facilities as ASCs for billing purposes.  However, the concept of such a "satellite" ASC facility does not exist—a facility is either a qualified ASC, or it is not.

7.      Defendants knowingly and intentionally submitted these false and fraudulent claims to the federal government (Medicare) in order to increase their profits, as procedures performed at ASCs are subject to additional charges associated with increased overhead from pre- and post-operative services, nursing, anesthesia, and other safety precautions.  It is fraudulent to charge CMS a fee for an ASC if the procedure was not performed at an ASC, but rather in an office setting.

8.      Relator's investigatory efforts, as well as non-public documents in Relator's possession, reveal that Defendants submitted false billing claims to CMS ranging into the millions or even tens of millions of dollars in connection with their scheme.

9.      Relator's current knowledge is based upon, among other things, non-public access to an electronic billing system utilized by the Tower Providers, the Azalea Electronic Medical Record system ("Azalea"), that goes back to March 2015.  It is possible, if not likely, that the fraudulent billing practices described herein pre-dates

1  March 2015 and are accessible via the Tower Providers' prior electronic billing system,

2  Lytec.  The full extent of the fraudulent billing practices described herein is not currently

3  known.

4       10.    Furthermore, Defendants altered their billing practices in or around March

5  2021, when Relator reviewed a CMS billing claim at the request of Daniel Aronowitz

6  and subsequently advised Defendants as to the noncompliant nature of their billing

7  practices, which spurred a more thorough review over the next month or so.  Despite

8  discovering their own billing practices to be noncompliant with CMS requirements, and

9  changing their billing practice to omit the fraudulent ASC facility fees going forward,

10  Defendants have failed to report the historical practices to CMS and have taken no steps

11  to repay the federal government.  Put simply, Defendants are intentionally continuing to

12  withhold these overpayments with full knowledge that those profits were obtained

13  unlawfully.

14       11.    Upon Relator's reporting of the issues to Defendants, they *accused Relator*

15  of developing and approving the fraudulent billing scheme—causing Relator a great deal

16  of distress and anguish—despite the fact that Defendants' practice pre-dated Relator's

17  employment by approximately two years.  Additionally, Relator was also demoted from

18  "Revenue Cycle Manager" to "Billing Specialist, TMMG" in January 2022 as a form of

19  informal retaliation for speaking up about Defendants' billing practices, although

20  Relator's salary remained the same.

21       12.    Medicare is administered by the Centers for Medicare & Medicaid

22  Services, an arm of the United States government, and provides health coverage to

23  people 65 years of age and older.  Medicare's soaring costs are staggering.  For instance,

24  Medicare expenditures accounted for 14% of all federal spending in 2013.  Knowing

25  that the government lacks the ability to track the massive amount of Medicare money as

26  it flows through the complex healthcare delivery system, unscrupulous companies see

27  government money as a source for padding their profits.  Defendants have become a part

28  of this problem through their abuse of the Medicare program—a program designed to

benefit senior citizens, not private companies.

13.     Non-public information personally known to Relator serves as the basis for this action.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over the False Claims Act ("FCA") causes of action raised in this complaint under 28 U.S.C. § 1331, as they arise under Federal law. This Court also has jurisdiction over the FCA claims pursuant to 31 U.S.C. § 3732, which confers jurisdiction for claims brought under the FCA on the District Courts of the United States.

15.     Venue is proper pursuant to 31 U.S.C. § 3732(a), as Defendants transact business in this district, can be found in this district, and the fraudulent conduct was committed in this district.

## III.    PARTIES

16.     The Plaintiff in this action is the United States of America ("United States") by and through Relator Harold Bautista.  Throughout the time period relevant to this Complaint, the United States Department of Health and Human Services and the Centers for Medicare & Medicaid Services ("CMS") were agencies of the United States, and their activities, operations, and contracts were paid from United States funds.

17.     Relator Harold Bautista, a resident of Los Angeles, California, began working for Tower Outpatient on March 15, 2017 as a Biller, and then as a Revenue Cycle Manager from late-2019 through January 2022, at which point he was demoted to Billing Specialist, TMMG, a title he continues to hold through the present.  Relator's responsibilities as a Biller and/or Revenue Cycle Manager spanned various billing and accounting functions, including with respect to the auditing of bills submitted to CMS for medical services provided at locations operated by the Tower Providers.  In his role as Revenue Cycle Manager, Relator reported directly to then-Revenue Cycle Director, Daniel Aronowitz.  Relator became a certified professional medical auditor (CPMA) when he received his AAPC (American Academy of Professional Coders) auditor

1  certificate in 2019 and is also currently a certified professional coder (CPC), certified

2  professional biller (CPB), and a certified ambulatory surgery center coder (CASCC).

3  Relator is in possession of non-public information of Defendants' wrongdoing,

4  including but not limited to, the information contained herein.  Relator is unaware of any

5  public disclosure of the allegations of this action, but to the extent any exist, Relator

6  qualifies as an Original Source.

7       18.    Defendant Tower Outpatient Surgery Center, Inc. ("Tower Outpatient") is

8  a California Corporation based in Los Angeles, California that does significant business

9  in this District.  Tower Outpatient operates a qualified ASC located at 8635 W. 3rd St.,

10  Suite 1090W, Los Angeles, CA 90048, which provides a broad variety of surgical

11  services including plastic surgery, podiatry, and general surgery.

12       19.    Defendant Tower Wound Care Center of Santa Monica, Inc. ("Tower

13  Wound Care") is a California Corporation based in Los Angeles, California that does

14  significant business in this District.  Tower Wound Care operates a qualified ASC

15  located at 1301 20th St., Suite 470, Santa Monica, CA 90404, which primarily offers

16  wound care services, including surgical procedures such as amputations.

17       20.    Defendant Joel A. Aronowitz, M.D., A Medical Corporation, doing

18  business as Tower Multi-Specialty Medical Group ("Tower Multi-Specialty"), is a

19  medical corporation based in Los Angeles, California that does significant business in

20  this District.  Tower Multi-Specialty offers wound care services, among other in-office

21  medical services.  Tower Multi-Specialty operates a physician's office located at 8635

22  W. 3rd St., Suite 1085W, Los Angeles, CA 90048, which is openly connected to the

23  ASC operated as Tower Outpatient, as the two facilities are located in adjacent suites

24  that share an adjoining area.  Tower Multi-Specialty also operates a physician's office

25  in Santa Monica, which was located at 1301 20th St., Suite 470, Santa Monica, CA

26  90404 (the same suite as the ASC operated as Tower Wound Care in Santa Monica) until

27  March 2021, although the office has since been moved to 2001 Santa Monica Blvd.,

28  Suite 490W, Santa Monica, CA 90404.  Tower Multi-Specialty also operates additional

clinical offices at the following locations:

- Encino:  16101 Ventura Blvd., Suite 238, Encino, CA 91436
- Culver City:  9640 Venice Blvd., Culver City, CA 90232
- Pasadena:  625 S. Fair Oaks Ave., Suite 155, Pasadena, CA 91105
- West Hollywood:  7531 Santa Monica Blvd., Suite 202, West Hollywood, CA 90046
- Lynwood:  3628 E. Imperial Hwy, Suite 302, Lynwood, CA 90262

21.     Tower Outpatient, Tower Multi-Specialty, and Tower Would Care all list the same entity address on their W9s as well as the California Secretary of State business directory, 8635 W. 3rd St., Suite 1090W, Los Angeles, CA 90048, which is the address of the ASC facility operated as Tower Outpatient.  Joel Aronowitz is, and was at all relevant times, the Chief Executive Officer of Defendants Tower Outpatient, Tower Multi-Specialty, and Tower Wound Care.  Sarah Chalom, the daughter of Joel Aronowitz, has held the position of Chief Operating Officer for the Tower Providers since early 2020, and previously held a marketing position with the Tower Providers.

22.     Defendant Tower Medical Billing Solutions, doing business as Medicommerce ("Tower Billing"), is a California Corporation based in Los Angeles, California that does significant business in this District.  Tower Billing was contracted to provide billing and accounting services to the Tower Providers from September 2018 through June 2021, including claim submissions, payment postings, account collections, and compliance reviews (among other things).  Tower Billing also lists 8635 W. 3rd St., Suite 1090W, Los Angeles, CA 90048 as its entity address on the California Secretary of State business directory.  Daniel Aronowitz, the son of Joel Aronowitz, has been the Chief Executive Officer of Tower Billing since it was incorporated in September 2017, and held the position of Revenue Cycle Director for the Tower Providers from approximately April 2018 through June 2021, although Daniel Aronowitz continued to be involved in the Tower Providers' billing processes through July 2021 to assist with transitioning his responsibilities to the new billing contractor, Azalea Health.  Joel

Aronowitz, Daniel Aronowitz, and/or Sarah Chalom are, and/or were during the relevant time period (2015 or earlier through approximately March 2021) or some portion thereof, the authoritative decision maker(s) with respect to the Tower Providers' revenue cycle, billing practices, human resources, and employment functions.   Medical personnel such as physicians and physician's assistants are typically not informed how their procedures are billed.

23.   Relator alleges that at all times relevant to the events giving rise to this action, each and every Defendant was acting as an agent or joint venturer of each of the other Defendants. Relator further alleges that at all times relevant to those events, each and every Defendant was acting within the course and scope of that agency or joint venture at the direction of or with the full knowledge, permission, or consent of each and every other Defendant. In addition, each of the acts or omissions of each and every Defendant was made known to, and ratified by, each of the other Defendants.

## IV.   OVERVIEW OF THE SCHEME

### A.   The United States Medicare System

24.   Medicare is a federally funded health care program that provides medical insurance coverage to qualified residents of the United States who are aged 65 and older, younger people with permanent or congenital disabilities, or those who meet other special criteria like the End Stage Renal Disease program.   The vast majority of Medicare's costs are paid by United States citizens through their taxes.   Medicare pays for medical expenses, such as doctor visits and hospital stays.

25.   Title XVII of the Social Security Act establishes the Medicare Program (technically, the "Health Insurance for the Aged and Disabled Program").   See 42 U.S.C. § 1397 *et seq*.

26.   The United States provides reimbursement for Medicare claims from the Medicare Trust Funds through the Centers for Medicare & Medicaid Services ("CMS"), which is the operating division of the United States Department of Health & Human Services ("HHS").   CMS, in turn, contracts out to Medicare Administrative Contractors

("MACs"), also known as carriers, to review, approve, and pay Medicare claims received from healthcare providers.

27.     Medicare payments are typically made directly to healthcare providers rather than the patient, as Medicare recipients routinely assign their right to payment to the healthcare provider.  Once a Medicare recipient assigns their right to payment to a provider, the provider then submits its bill directly to Medicare for payment.

28.     To bill Medicare, a provider must submit an electronic or hard-copy claim form called a CMS-1500 form.  The CMS-1500 form requires the provider to state, among other things, the identity of the patient and rendering provider, the service(s) and/or procedure(s) for which it is billing Medicare, and the location where the service(s) and/or procedure(s) were rendered.  Services and/or procedures provided are identified by numerical codes called Current Procedural Terminology ("CPT") codes, with each separate code corresponding to a distinct service or procedure.

29.     All healthcare providers must comply with all applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare.  Providers have a duty to have knowledge of the relevant statutes, regulations, and guidelines regarding coverage for Medicare services.

30.     Because it is not realistically feasible to review medical documentation before paying each claim, MACs generally make payment under Medicare based on the providers' obligation to submit truthful and accurate billing information.

**B.     Ambulatory Surgical Centers ("ASCs")**

31.     Ambulatory surgery centers, commonly referred to as "ASCs," are defined under federal regulations as "any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following admission." 42 C.F.R. § 416.2.

32.     To qualify as an ASC for purposes of Medicare coverage, the medical facility must satisfy a litany of conditions—including with respect to accreditation, state

1  licensure, medical recordkeeping, on-site medical equipment, medical personnel, and

2  quality of medical services provided—and must also enter into an agreement with CMS.

3  See 42 C.F.R. §§ 416.25–416.35, 416.40–416.54.

4      33.    ASCs are subject to certain Medicare coverage and payment provisions that

5  differ from those applicable to other types of medical facilities, such as medical offices.

6  As relevant here, procedures performed at an ASC are subject to additional billing

7  charges as compared to those performed in an office setting, because of the higher level

8  of medical care and equipment—charges that are inapplicable to procedures performed

9  at other, non-ASC facilities.  See generally 42 C.F.R. §§ 416 *et seq.*

10      34.    Additionally, ASCs must operate as separate and distinct facilities to be

11  eligible for Medicare coverage and payment terms under the provisions specific to

12  ASCs.  For example, as explained on CMS's website:  "The regulatory definition of an

13  ASC does not allow the ASC and another entity, such as an adjacent physician's office,

14  to mix functions and operations in a common space during concurrent or overlapping

15  hours of operations."[1]

16      35.    Out of the several facilities operated by the respective Tower Providers as

17  described above, only two are qualified ASCs—the Tower Outpatient facility at 8635

18  W. 3rd St., Suite 1090W, Los Angeles, CA 90048, and the Tower Wound Care facility

19  at 1301 20th St., Suite 470, Santa Monica, CA 90404.  On the other hand, none of the

20  facilities operated as Tower Multi-Specialty are (or were) qualified ASCs, including the

21  above-listed clinical facilities in Los Angeles (adjacent to the Tower Outpatient ASC),

22  Santa Monica (in the same suite as the Tower Wound Care ASC), Encino, Culver City,

23  Pasadena, West Hollywood, or Lynwood.  Accordingly, procedures performed by

24  facilities operated as Tower Multi-Specialty were *not* eligible for Medicare coverage and

25  payment under the provisions specific to ASCs during the relevant time period (2015 or

26  earlier through approximately March 2021).

27  ///

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

---

[1] https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/ASCs.

**COMPLAINT**

C.    **Defendants' Fraudulent Billing Scheme**

36.    In order to increase their profits, Defendants knowingly and intentionally devised, implemented, and/or continued a scheme whereby they billed CMS for wound care procedures (e.g. basic debridement, the application of skin substitute grafts, etc.) performed at the non-ASC facility operated as Tower Multi-Specialty in Los Angeles as though they were performed at the adjacent ASC facility operated as Tower Outpatient (a qualified ASC).  Similarly, Defendants also billed procedures performed at the non-ASC facility operated as Tower Multi-Specialty in Santa Monica as though they were performed at the ASC facility operated as Tower Wound Care in the same suite.  These basic wound care procedures do not require the additional level of medical personnel and equipment required by an ASC, nor were they performed at an ASC in these instances.

37.    Defendants also concocted the phony concept of a "satellite" ASC by treating the non-ASC facilities operated as Tower Multi-Specialty in Encino, Culver City, and Pasadena (the "Purported Satellite ASCs") as ASCs in their billing claims. Again, these Tower Multi-Specialty facilities are not qualified ASCs, and the clinical offices in Encino, Culver City, and Pasadena are not even located anywhere near either of the two ASC facilities operated as Tower Outpatient and Tower Wound Care.

38.    This scheme enabled Defendants to reap the benefits of additional, fraudulent charges associated with the performance of the procedures at an ASC facility, which would otherwise be inapplicable to procedures performed at non-ASC facilities.

39.    Put simply, Defendants lied about where wound care procedures were performed and/or lied about the nature of the facilities where services were performed in thousands of submitted billing claims in order to defraud CMS via excess, unlawful charges associated with the use of an ASC.

40.    In the case of Medicare patients, CMS typically paid 80 percent of the respective claim amounts, with the remaining 20 percent covered by secondary/supplemental insurance or by the patients themselves.  Thus, CMS paid 80

percent of the total overcharges from Defendants' fraudulent billing scheme.

41.     Defendants' billing scheme typically encompasses three categories of charges for services provided as part of a particular patient procedure: first, a charge for an office visit, which is generally the same regardless of whether the visit occurs at an ASC or non-ASC facility; second, one or more charges for services rendered, which are also generally the same between ASC and non-ASC facilities; and third, **charges associated with performance of the procedure at an ASC**, which, by definition, cannot be billed for procedures performed at non-ASC facilities.

42.     As part of their billing submissions to CMS, Defendants are required to enter codes for the applicable "place of service" (or "POS"), which, as relevant here, are reflected in Azalea as either "Office (11)" or "Ambulatory Surgical Center (24)."

43.     Attached hereto as **Exhibit A** are screenshots of a spreadsheet exported from Azalea by Relator, which contains illustrative examples (without personal identifying medical information) of fraudulent submissions to CMS regarding six different procedures.  The examples in Exhibit A are a small subset of the thousands of false claims submitted under Defendants' scheme.

44.     Billing charge entries in Exhibit A are color-coded to differentiate between the three categories of charges: first, an office visit (green); second, one or more charges for procedures performed (gold); and third, **charges associated with performance of the procedure at an ASC** (red).  As reflected in these examples, Defendants typically billed the first category, a patient's office visit, using POS code 11, corresponding to an "Office" place of service location.  These charges are not fraudulent.

45.     However, in furtherance of their fraudulent billing scheme, Defendants then billed charges in the second category, services rendered to the patient, using POS code 24, corresponding to an "Ambulatory Surgical Center" place of service location, despite the fact that the patient never set foot in an ASC facility, as confirmed by Relator through review of the medical records and documentation associated with these particular patient procedures, and as is consistent with Relator's personal observation

that, as a general matter, patients are not moved between non-ASC and ASC facilities as part of a procedure performed on that patient.  These charges are technically fraudulent because they list an incorrect place of service, but typically are not associated with overcharging or overpayment because the billing rates are generally the same between ASCs and non-ASC facilities.  Although the gold-coded entries in the second category did not result in overpayment directly, the incorrect use of POS code 24 for these charges was a necessary step for Defendants to bill the third category of charges for performance of the procedure(s) at an ASC facility.  Billing procedures as being performed at an ASC allowed Defendants to submit and be reimbursed for the ASC facility charges.

46.     Accordingly, all of the red-coded entries in Exhibit A—corresponding to the third category of charges for performance of the applicable procedures in an ASC facility—are materially false and fraudulent claims that resulted in overpayment by CMS, as none of the patients in these examples were treated at an ASC.

47.     Below are the applicable CPT codes and CMS's description of the particular service or procedure corresponding to each code.

- CPT 15275 applies to skin substitute graph procedures whereby the provider uses a skin substitute, such as an allograft or xenograft, to cover wounds on the face, scalp, eyelids, mouth, neck, ears, orbits, genitalia, hands, feet, and/or multiple digits, up to an area of 100 square centimeters. This billing code covers up to the first 25 square centimeters.  The patient-visits from examples 1 and 6 in Exhibit A incurred billing charges for performance of the CPT 15275 procedure at an ASC, although the procedures were performed at non-ASC facilities.

- CPT 15271 applies to skin substitute graph procedures whereby the provider uses a skin substitute, such as an allograft or xenograft, to cover wounds on the patient's trunk, arms, and/or legs up to an area of 100 square centimeters.  This billing code covers up to the first 25 square centimeters.

The patient-visits from examples 1–5 in Exhibit A incurred billing charges for performance of the CPT15271 procedure at an ASC, although here too the procedures were not performed at an ASC.

- CPT Q4196 applies to the use of the medical product Puraply AM, an antimicrobial barrier product intended for the management of certain types of wounds.  This code covers the use of one square centimeter of Puraply AM. The patient visits from examples 4 and 5 in Exhibit A incurred billing charges for the use of Puraply AM as part of a procedure performed at an ASC, although, as noted above, these procedures were performed at non-ASC facilities.

- CPT Q4195 applies to the use of the medical product Puraply, which is similar to Puraply AM.  This code covers the use of one square centimeter of Puraply.  The patient visits from examples 1, 2, 3, and 6 in Exhibit A incurred billing charges for the use of Puraply as part of a procedure performed at an ASC, but none of these procedures were actually performed at an ASC.

48.     These examples in Exhibit A are emblematic of thousands of instances of similar false and fraudulent billing submissions by the Tower Providers, as reflected in more comprehensive Azalea records obtained by Relator, described further below.

## V.     **RELATOR'S INVESTIGATION**

49.     Relator's investigatory efforts, including non-public information obtained from the Tower Providers' Azalea system, has revealed that Defendants' fraudulent billing scheme dates back to at least 2015 (when the Tower Providers began using Azalea) and continued through approximately March 2021 (when Defendants changed their billing practices following the audit described more fully below).

50.     Relator is in possession of a spreadsheet that he exported from the Tower Providers' Azalea system (the "Azalea Spreadsheet"), which lists procedures and accompanying    billing    submitted    to    CMS    (as    well    as    providers    of

secondary/supplemental insurance and/or the patient directly) by each Tower Provider from March 2015 through January 2022.  The spreadsheet includes, for each itemized billing claim, information regarding the patient to whom services were provided; the date on which services were provided; the physician who rendered the services; the applicable service rendered as identified by a CPT code; the facilities where services were purportedly rendered; the billing provider (i.e., Tower Outpatient, Tower Multi-Specialty, or Tower Wound Care); whether the services were billed as taking place at an office location versus an ASC; and the corresponding CMS/insurance payment for the applicable service, among other information.

51.     In many cases, the fraudulent nature of billing claims is readily apparent from the face of the Azalea Spreadsheet.  For example, numerous charges were submitted using POS code 24 (ASC place of service location), but with the location specified as Encino, Culver City, or Pasadena.  These claims are false on their face because there are no ASC facilities operated by any of the Tower Providers in Encino, Culver City, or Pasadena—rather, there are only the Purported Satellite ASCs operated as Tower Multi-Specialty, which are not qualified ASC facilities.  Thus, any such charges associated with the performance of services at a Purported Satellite ASC are materially false claims that directly resulted in overpayment by CMS.

52.     Moreover, there are many instances of fraudulent charges similar to the illustrative examples in Exhibit A, discussed above, which are capable of identification where the patient procedure involves an office visit charge (correctly) billed using "Office" POS code 11, but also involves one or more procedure charges (incorrectly) billed using "Ambulatory Surgery Center" POS code 24.  Because patients are almost never moved between non-ASC clinical facilities and ASC facilities as part of the same procedure—based on Relator's personal observations in general and capable of verification for each patient procedure through review of the applicable medical records and patient sign-in sheets—these charges are likewise false and fraudulent, and any such charges associated with the performance of services at an ASC facility are materially

1 false claims that directly resulted in overpayment by CMS

2   53. Based on Relator's experience and by virtue of his employment with Tower

3 Outpatient, his review of Defendants' records show an incorrect number of surgeries

4 billed as performed by various providers.  For example[2]

- **Kazuo Suzuki**, a Doctor of Podiatric Medicine at the Los Angeles clinic operated as Tower Multi-Specialty, has performed a small number of actual surgeries during his 5-year tenure, estimated by Relator to be approximately 20 or less, but the Azalea Spreadsheet reflects over 78,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $30 million in charges.  The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Romina Vincenti**, a Doctor of Podiatric Medicine at the Santa Monica clinic operated as Tower Multi-Specialty, has likewise performed a small number of actual surgeries, estimated by Relator to be approximately 20 or less, but the Azalea Spreadsheet reflects over 28,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $9 million in charges.  The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Adam Brown**, a Doctor of Podiatric Medicine at the Encino clinic operated as Tower Multi-Specialty, has similarly performed approximately 20 or fewer actual surgeries, based on Relator's estimate, but the Azalea Spreadsheet reflects over 11,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $5 million in charges.  The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Joel Aronowitz**, M.D. at the Los Angeles clinic operated as Tower Multi-

---

[2]  These examples address claims submissions with respect to Medicare patients only, although there are additional similar charges for non-Medicare patients.

Specialty, has performed approximately 50 actual surgeries at the adjacent ASC operated as Tower Outpatient, based on Relator's estimate, but the Azalea Spreadsheet reflects over 6,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $5 million in charges.

- **Jason Morris**, a Doctor of Podiatric Medicine at the Los Angeles clinic operated as Tower Multi-Specialty, has performed approximately 10 surgeries at the adjacent ASC operated as Tower Outpatient during his 2-year tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects nearly 8,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $5 million in charges.

- **Bridget Winterhalter**, P.A. is a physician's assistant to Joel Aronowitz, M.D. at the Los Angeles clinic operated as Tower Multi-Specialty and has performed approximately 10 or fewer surgeries, based on Relator's estimate, but the Azalea Spreadsheet reflects almost 5,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of almost $4 million in charges.  The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **James Knudson**, a Doctor of Podiatric Medicine at the Culver City clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries or fewer at the adjacent ASC operated as Tower Outpatient during his 3-year tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects just under 2,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $850,000 in charges.  The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Albemar Espiritu**, a Doctor of Podiatric Medicine at the Santa Monica clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries

or fewer at the ASC operated as Tower Wound Care during his 1-year tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects over 2,000 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $500,000 in charges. The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Emily Chau**, a Doctor of Podiatric Medicine at the Pasadena clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries or fewer at the adjacent ASC operated as Tower Outpatient during her 8-month tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects over 800 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $250,000 in charges. The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Jennifer Winnick**, P.A., a physician's assistant to Joel Aronowitz at the Los Angeles clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries or fewer at the adjacent ASC operated as Tower Outpatient during her 1-year tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects over 100 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $100,000 in charges. The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Jessica Olson**, a Doctor of Podiatric Medicine at the Culver City clinic operated as Tower Multi-Specialty, has performed approximately 20 surgeries or fewer at the ASC operated as Tower Outpatient, based on Relator's estimate, but the Azalea Spreadsheet reflects around 250 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $75,000 in charges. The vast majority

of these minor surgical procedures took place in an office setting, not an ASC.

- **Amrita Kaur**, P.A., a physician's assistant to Joel Aronowitz at the Los Angeles clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries or fewer at the adjacent ASC operated as Tower Outpatient during her 1-year tenure, based on Relator's estimate, but the Azalea Spreadsheet reflects over 100 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $40,000 in charges. The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

- **Jennifer Lee**, a Doctor of Podiatric Medicine at the Pasadena clinic operated as Tower Multi-Specialty, has performed approximately 5 surgeries or fewer at the ASC operated as Tower Outpatient, based on Relator's estimate, but the Azalea Spreadsheet reflects around 50 rows of CMS-reimbursed ASC facility claims, consisting of minor surgical procedures and skin grafts, amounting to a total of over $13,000 in charges. The vast majority of these minor surgical procedures took place in an office setting, not an ASC.

54. Moreover, because the Tower Providers' recordkeeping procedures involve separate systems for recording information about patient visits at a non-ASC facility (recorded in Azalea) versus procedures performed at an ASC facility (referred to as "surgical notes"), it is possible to verify whether a particular claim is fraudulent by cross-checking the billing charge with the corresponding notes for the applicable patient procedure. For instance, if services rendered to a patient are billed as having occurred at an ASC facility but no corresponding surgical notes exist for the particular patient procedure, that would indicate that the billing claim is fraudulent. Moreover, notes for that patient should then exist in the Azalea system, and a review of those notes will confirm that the patient did not step foot into an ASC facility during the course of the applicable procedure.

55. Defendants' scheme may have begun even earlier than 2015, although the

1   exact starting point is unknown to Relator without the benefit of discovery, as the Tower

2   Providers' previous electronic billing system, Lytec, is currently inaccessible to Relator.

3   However, Relator is informed and believes and thereupon alleges, that the Lytec billing

4   system still exists and is accessible by one or more of the Defendants.

5   **VI.   DEFENDANTS CONTINUE TO INTENTIONALLY WITHOLD**

6   **PAYMENTS**

7       56.     Relator became aware of Defendants' fraudulent billing practices in or

8   around March 2021, when he reviewed a CMS billing claim at the request of Daniel

9   Aronowitz, then-Revenue Cycle Director, and subsequently advised Defendants as to

10  the noncompliant nature of their billing practices.

11      57.     The Tower Providers then retained a law firm to assist with a more detailed

12  review of Defendants' billing claims and practices.

13      58.     On April 13, 2021, Relator was interviewed by several attorneys at the

14  Tower Multi-Specialty office in Culver City, regarding what was described as "a routine

15  government investigation."  During this interview, which lasted several hours, Relator

16  learned that Daniel Aronowitz had *accused Relator* of authorizing the fraudulent billing

17  scheme.

18      59.     However, Relator was simply following the billing instructions provided

19  by then-Revenue Cycle Directors Suzanne Nogle (August 2016 – April 2018) and Daniel

20  Aronowitz (April 2018 – July 2021).  In any case, the Azalea Spreadsheet reflects that

21  Defendants' fraudulent practices span back to 2015, approximately two years prior to

22  Relator's employment.

23      60.     Eight days after this interview, on April 21, 2021, Relator was assigned by

24  Daniel Aronowitz to review a portion of the Tower Providers' ASC billing claims—

25  including spot checks of documentation regarding the applicable appointment dates,

26  surgical notes, invoices, and equipment usage.

27      61.     Relator remained involved in the audit following the interview and

28  continued to voice his concerns about the improper ASC charges.  For instance, in an

April 22, 2021 email from Relator to three Tower Billing employees with responsibilities for submitting and overseeing the Tower Providers' billing claims—Ashok Kumar, Prashad Sethu, and Daniel Aronowitz—Relator described various errors identified by him in reviewing a CMS billing claim as an example.

62.     Tellingly, Defendants ultimately changed their billing practices and ceased their fraudulent ASC charges scheme for services rendered after mid-March 2021. Moreover, Daniel Aronowitz and Defendant Tower Billing, then-Revenue Cycle Director and then-billing consultant, respectively, became uninvolved with the Tower Providers within just a few months of the above-described billing audit.  Their revenue cycle responsibilities ended on June 15, 2021.

63.     However, Defendants have done nothing to address the myriad fraudulent billing claims they submitted to CMS over a period spanning approximately 6 years or more leading up to March 2021.  Defendants have not taken any steps to return such overpayments, nor have they reported their prior billing practices to the government.

64.     Despite Defendants' full knowledge that they defrauded Medicare of tens of millions of dollars or more in overpayments, Defendants have retained and failed to return any of the ill-gotten monies paid to them by CMS.  Defendants are intentionally withholding these overpayments and do not appear to have any intention of ever making appropriate returns.

## VII.   CAUSES OF ACTIONS

### FIRST CAUSE OF ACTION

### On Behalf of the United States against All Defendants

### Federal False Claims Act, Presenting False Claims

### 31 U.S.C. § 3729(a)(1)(A)

65.     Relator incorporates herein by reference and realleges the above allegations.

66.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee

1    of the United States.

2         67.    Defendants knowingly presented or caused to be presented false records

3    and statements, including but not limited to claims, bills, invoices, requests for

4    reimbursement, and records of services, in order to obtain payment or approval of

5    charges by CMS.

6         68.    Among other things, Defendants knowingly devised, implemented, and

7    engaged in a pattern and practice whereby the Tower Providers billed CMS for

8    procedures as though they were performed at the qualified ASCs operated as Tower

9    Outpatient and/or Tower Wound Care, and included additional billing charges

10   associated with the performance of such procedures at an ASC, when those procedures

11   were in fact performed at non-ASC facilities operated as Tower Multi-Specialty, and

12   thus not eligible for the billing charges associated with performance of the procedures

13   at an ASC.

14        69.    Among other things, Defendants knowingly devised, implemented, and

15   engaged in a pattern and practice whereby they billed CMS for procedures performed at

16   the Purported Satellite ASCs as though those facilities were in fact ASCs (they are not)

17   by concocting the erroneous concept that the Purported Satellite ASCs operated as

18   Tower Multi-Specialty could be billed as ASCs by calling them "satellite locations" to

19   the ASC operated as Tower Outpatient.

20        70.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a

21   substantial factor in causing the United States to sustain damages in an amount according

22   to proof.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP          **COMPLAINT**                                                      21

## SECOND CAUSE OF ACTION

### On Behalf of the United States against All Defendants

### Federal False Claims Act, Making or Using False Records or Statements

### Material to Payment or Approval of False Claims

### 31 U.S.C. § 3729(a)(1)(B)

71.     Relator incorporates herein by reference and realleges the above allegations.

72.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

73.     Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to claims, bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by CMS.

74.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## THIRD CAUSE OF ACTION

### On Behalf of the United States against All Defendants

### Federal False Claims Act, Retention of Proceeds to Which Not Entitled

### 31 U.S.C. § 3729(a)(1)(G)

75.     Relator incorporates herein by reference and realleges the above allegations.

76.     In the alternative, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the government.

77.     As discussed above, Defendants received far more money from CMS than

they were entitled to.  Defendants knew, and still know, that they received more money than they were entitled to, and avoided, and continue to avoid, their obligation to return the excess money to the government.

78.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and were a substantial factor in causing the United States to sustain damages in an amount according to proof.

79.     Section 3729(a)(1)(G) imposes liability on any person who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

80.     Defendants have had full knowledge that their fraudulent billing schemes resulted in overpayments from CMS as a direct result of Defendants' unlawful conduct, but have failed to return any overpayments over the course of nearly a full year since Defendants altered their billing practices following the investigation and audit involving Relator and an outside law firm.  Defendants continue to intentionally withhold such refund payments to this day.

81.     As a result of Defendants' actions, the United States has been and will continue to be, severely damaged.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, by and through the Relator, prays judgment in its favor and against Defendants as follows:

1.     That judgment be entered in favor of Plaintiff United States of America *ex rel.* Harold Bautista, and against Defendants Tower Outpatient Surgery Center, Inc., Joel A. Aronowitz, M.D., A Medical Corporation, doing business as Tower Multi-Specialty Medical Group, Tower Wound Care Center of Santa Monica, Inc., and Tower Medical Billing Solutions, according to proof on the First, Second, and Third Causes of Action for damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

i.     Triple the amount of damages sustained by the United States;

ii.     Civil penalties of up to $22,607 for each false claim and/or false

1    statement;

2    iii.   Recovery of costs, attorney's fees, and expenses;

3    iv.   Pre- and post-judgment interest; and

4    v.   Such other and further relief as the Court deems just and proper.

5    2.    Further, as to the First, Second, and Third Causes of Action, Relator on his

6  own behalf, requests that he receives such maximum amount as permitted by law, of the

7  proceeds of this action or settlement of this action collected by the United States, plus

8  an amount for his reasonable expenses incurred, plus reasonable attorney's fees and

9  costs of this action.  Relator requests that his percentage be based upon the total value

10  recovered, including any amounts received from individuals or entities not parties to this

11  action.  Relator also requests that he be awarded all costs of this action, including

12  attorney's fees and expenses.

13    3.    That Relator recover such other and further relief as the Court deems just

14  and proper.

15  **IX.   <u>DEMAND FOR JURY TRIAL</u>**

16    Relator demands a jury trial on all issues so triable.

17

18    Dated: March 21, 2022                **COTCHETT, PITRE & McCARTHY, LLP**

19

20    By: _____

21    NIALL P. MCCARTHY

22    TAMARAH P. PREVOST

23    KELLY W. WEIL
      THERESA E. VITALE

24    JEFFREY G. MUDD
      *Attorneys for Relator*

25

26

27

28

# EXHIBIT A

| # of Claims Filed | Patient Name | Rendering Provider | Place of Service Location + Code | Billing Provider | Primary Insurance | Date of Service | Units | CPT | Charges | Insurance Payment | Insurance Adjustment | Allowed Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Example #1:** | | | | | | | | | | | | |
| Claim #1 | Patient 1 | Doctor A | Office (11) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/3/2020 | 1 | 99214 | 250 | ($121.21) | ($128.79) | 121.1 |
| Claim #2 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/3/2020 | 1 | 15275 | 340 | ($105.19) | ($234.81) | 105.1 |
| Claim #2 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/3/2020 | 1 | 15271 | 330 | ($46.67) | ($273.33) | 93.25 |
| Claim #2 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/3/2020 | 1 | 15272 | 65 | ($19.15) | ($45.85) | 19.13 |
| Claim #2 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/3/2020 | 54 | Q4195 | 16200 | ($5,567.45) | ($10,632.55) | 5567.45 |
| Claim #3 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/3/2020 | 1 | 15275 | 1760 | ($946.76) | ($813.24) | 946.76 |
| Claim #3 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/3/2020 | 1 | 15271 | 1760 | ($473.38) | ($1,286.62) | 946.76 |
| Claim #3 | Patient 1 | Doctor A | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/3/2020 | 54 | Q4195 | 16200 | ($5,567.40) | ($10,632.60) | 5567.4 |

*Patient 1 had an appointment at the Office (11) location but has never set foot inside the actual Ambulatory Surgical Center facility (24). Claim #2 is filed as submitted to Medicare on claims #2 and #3. No documentation proof or medical records that patient is seen at the ASC facility.

Claim #3 does not meet CMS requirements as stated on CMS Claims Processing Manual Chapter 14. Claim #2 is filed as ASC location so claim #3 would not be billable and reimbursable.

| # of Claims Filed | Patient Name | Rendering Provider | Place of Service Location + Code | Billing Provider | Primary Insurance | Date of Service | Units | CPT | Charges | Insurance Payment | Insurance Adjustment | Allowed Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Example #2:** | | | | | | | | | | | | |
| Claim #1 | Patient 2 | Doctor B | Office (11) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/27/2020 | 1 | 99214 | 250 | ($121.21) | ($128.79) | 121.1 |
| Claim #2 | Patient 2 | Doctor B | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/27/2020 | 1 | 15275 | 320 | ($93.33) | ($226.67) | 93.25 |
| Claim #2 | Patient 2 | Doctor B | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/27/2020 | 2 | 15271 | 130 | ($38.29) | ($91.71) | 38.26 |
| Claim #3 | Patient 2 | Doctor B | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 8/27/2020 | 1 | 15275 | 1760 | ($946.76) | ($813.24) | 946.76 |
| Claim #3 | Patient 2 | Doctor B | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 8/27/2020 | 54 | Q4195 | 16200 | ($5,567.40) | ($10,632.60) | 5567.4 |

*Patient 2 had an appointment at the Office (11) location but has never set foot inside the actual Ambulatory Surgical Center facility (24). Claim #2 is filed as submitted to Medicare on claims #2 and #3. No documentation proof or medical records that patient is seen at the ASC facility.

Claim #3 does not meet CMS requirements as stated on CMS Claims Processing Manual Chapter 14. Claim #2 is filed as ASC location so claim #3 would not be billable and reimbursable.

| # of Claims Filed | Patient Name | Rendering Provider | Place of Service Location + Code | Billing Provider | Primary Insurance | Date of Service | Units | CPT | Charges | Insurance Payment | Insurance Adjustment | Allowed Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Example #3:** | | | | | | | | | | | | |
| Claim #1 | Patient 3 | Doctor C | Office (11) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/28/2020 | 1 | 99203 | 250 | ($119.98) | ($130.02) | 119.87 |
| Claim #2 | Patient 3 | Doctor C | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/28/2020 | 1 | 15275 | 320 | ($93.33) | ($226.67) | 93.25 |
| Claim #2 | Patient 3 | Doctor C | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/28/2020 | 14 | Q4195 | 4200 | ($1,443.41) | ($2,756.59) | 1443.41 |
| Claim #3 | Patient 3 | Doctor C | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/28/2020 | 1 | 15275 | 1760 | ($946.76) | ($813.24) | 946.76 |
| Claim #3 | Patient 3 | Doctor C | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/28/2020 | 14 | Q4195 | 4200 | ($1,443.40) | ($2,756.60) | 1443.4 |

*Patient 3 has an appointment at another office branch location but has never set foot inside the Los Angeles' Ambulatory Surgical Center facility (24) as submitted to Medicare on claims #2 and #3.

This is what the company called a "satellite" location. Doctor C is not rendering services at the Los Angeles ASC facility. No documentation proof or medical records that patient is seen in the ASC.

**Example #4:**

| # of Claims Filed | Patient Name | Rendering Provider | Place of Service Location + Code | Billing Provider | Primary Insurance | Date of Service | Units | CFT | Charges | Insurance Payment | Insurance Adjustment | Allowed Payment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Example #4:** | | | | | | | | | | | | |
| Claim #1 | Patient 4 | Doctor D | Office (11) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 5/15/2020 | 1 | 99213 | 170 | ($68.11) | ($101.89) | 83.73 |
| Claim #2 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 5/15/2020 | 1 | 15271 | 320 | ($75.85) | ($244.15) | 99.25 |
| Claim #2 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 5/15/2020 | 22 | Q4196 | 6600 | ($2,162.43) | ($4,324.43) | 2412.3 |
| Claim #2 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 5/15/2020 | 2 | Q4196 | 600 | ($206.87) | ($393.19) | 219.3 |
| Claim #3 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 5/15/2020 | 1 | 15271 | 1760 | ($757.41) | ($1,002.559) | 946.76 |
| Claim #3 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 5/15/2020 | 22 | Q4196 | 6600 | ($2,275.57) | ($4,324.43) | 2412.3 |
| Claim #3 | Patient 4 | Doctor D | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 5/15/2020 | 2 | Q4196 | 600 | ($206.87) | ($393.13) | 219.3 |

*Patient 4 has an appointment at another office branch location but has never set foot inside the Los Angeles' Ambulatory Surgical Center facility (24) so submitted to Medicare on claims #2 and #3.
This is what the company called a "Satellite" location. Doctor D is not rendering services at the Los Angeles ASC facility. No documentation proof or medical records that patient is seen at the ASC.

| **Example #5:** | | | | | | | | | | | | |
| Claim #1 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/18/2020 | 1 | 15271 | 320 | ($93.33) | ($226.67) | 93.25 |
| Claim #1 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/18/2020 | 2 | 15272 | 130 | ($38.29) | ($91.71) | 38.26 |
| Claim #1 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/18/2020 | 55 | Q4196 | 16500 | ($6,023.77) | ($10,476.23) | 6023.77 |
| Claim #1 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 8/18/2020 | 1 | Q4196 | 300 | ($109.52) | ($190.48) | 109.52 |
| Claim #2 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 8/18/2020 | 1 | 15271 | 1760 | ($946.76) | ($813.24) | 946.76 |
| Claim #2 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 8/18/2020 | 55 | Q4196 | 16500 | ($6,023.60) | ($10,476.40) | 6023.6 |
| Claim #2 | Patient 5 | Doctor E | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 8/18/2020 | 2 | Q4196 | 300 | ($109.52) | ($190.48) | 109.52 |

* Patient 5 has an appointment at ambulatory surgical branch location but has never set foot inside the Los Angeles' Ambulatory Surgical Center facility (24).
This is proof that even without an office visit charge these are Ambulatory Surgical Center facility claims submitted to Medicare on claims #1 and #2.

| **Example #6:** | | | | | | | | | | | | |
| Claim #1 | Patient 6 | Doctor F | Office (11) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/2/2020 | 1 | 99213 | 170 | ($83.80) | ($86.20) | 83.73 |
| Claim #2 | Patient 6 | Doctor F | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/2/2020 | 1 | 15275 | 340 | ($105.19) | ($234.81) | 105.1 |
| Claim #2 | Patient 6 | Doctor F | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/2/2020 | 1 | 15276 | 80 | ($28.22) | ($51.78) | 28.2 |
| Claim #2 | Patient 6 | Doctor F | Ambulatory Surgical Center (24) | Doctor/Professional Business TAX ID #1 | Noridian Medicare | 9/2/2020 | 46 | Q4195 | 13800 | ($4,742.65) | ($9,057.35) | 4742.65 |
| Claim #3 | Patient 6 | Doctor F | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/2/2020 | 1 | 15275 | 1760 | ($946.76) | ($813.24) | 946.76 |
| Claim #3 | Patient 6 | Doctor F | Ambulatory Surgical Center (24) | ASC Facility Business TAX ID #2 | Noridian Medicare | 9/2/2020 | 46 | Q4195 | 13800 | ($4,747.60) | ($9,057.40) | 4742.6 |

* Patient 6 has an appointment at the Office (11) location but has never set foot inside the actual Ambulatory Surgical Center facility (24) so submitted to Medicare on claims #2 and #3.
Claim #3 does not meet CMS requirements as stated on CMS Claims Processing Manual Chapter 14. No documentation proof or medical records that patient is seen at the ASC facility.